I have one case on the calendar for this afternoon. It is San Francisco Herring Association against the U.S. Department of the Interior, case 20-17412. And we'll be pleased to hear from Mr. Gregorian. Good afternoon, Your Honors. Todd Gregorian of Fenwick & West on behalf of Planted Propellant San Francisco Herring Association. If I may, I'd like to reserve five minutes for rebuttal. May it please the court. An agency may not act without a statutory delegation of authority from Congress. In this case is about an exercise of agency power that is still in search of a delegation after nearly a decade. When the Park Service first state to claim the parts of the San Francisco Bay and close the commercial herring fishery there, that fishery had existed regulated by the state unmolested for 30 years. When the Park Service took its action, it pointed to, as justification, a 1987 lease and 19th century transfers of bottomlands to the federal government conditional on military use. None of those transfers provided the Park Service with the necessary authority to do what it did. In fact, the lease states exactly the opposite. It says commercial fishing should be permitted in according to the regulations, the California Fish and Game Department. And so this appeal really concerns the Park Service. The Park Service is after the fact rationalizations for its unlawful action. So as the courts familiar, defendants claim that Congress gave them the authority over portions of the San Francisco Bay in both the National Park Service Organic Act and the Golden Gate National Recreation Area, enabling it. And I'll take those in turn. First, the Organic Act. This act gives the defendants authority over the national park system generally. It says the Park Service has jurisdiction over the parks and areas in the system, but it does not itself specify what properties form those parks. To use Justice Kagan's word from the Sturgeon case, the Organic Act pegs Park Service authority to system units. System units is the term that statute uses, and those are defined by the other statutes that create national parks. So according to the Supreme Court in that same Sturgeon case, this has significant consequences for the way the Organic Act applies. Where Congress does nothing but designate a system unit in a specified geographic area, the Organic Act allows the Park Service to regulate that area, irrespective of property ownership within the boundaries. Where Congress limits the Park Service's authority to federally owned properties within the boundaries, then, again to quote Sturgeon, its rules cannot apply to any non-federal properties, even if a map would show they are within such a unit's boundaries. Just to pause you there. Sorry, I didn't mean to interrupt you. I'm sorry, Judge Wallace, I didn't hear you. Go right ahead. Should we be concerned about the problems that come up when this is water that's away from the shores? Isn't there a federal interest in any navigable waters that belong to the United States? Doesn't that give them some leg for jurisdiction? So Congress, Judge Wallace, has legislative jurisdiction over those waters, and it may enact all manner of statutes that pertain to them. And where Congress does so, those statutes take precedence over whatever the state says about those areas, notwithstanding the state's property interests in the bottomlands and its accompanying interests in the preservation of waters for the public trust. The issue in this case is that's not what has happened. Congress has delegated to the agency the ability to acquire such interests as it may, and the federal agency has not acquired those interests. And so the case is much like Sturgeon. Excuse me, counsel, why do you say that the government has not acquired those interests? Certainly. Well, I would say, number one, the government has not contended in this case that it has acquired the interest. It has said it has not said that if the statutes are read the way we suggest that it has acquired the relevant interest. What it has instead said is that the federal government had certain bottomlands interest enactment of the GGNRA Act, and that should lead the court to read the statute in the way they suggest, which is that there is no acquisition of an interest acquired. But to answer your question specifically, no such interest has been acquired because the California public trust right prevented inferior agencies of the state of California from alienating California's rights in the waters above. But it's a federal government. And, you know, as you said just a moment ago, a lesser interest in the state of California. The federal government has. Well, no, the issue, Your Honor, is the federal government does not has not acquired a relevant property interest. But how is it that it's not acquired that interest? Sure. So it has it has only acquired conditional bottomlands transfers that have to do with military use. So those do not apply for several reasons. Number one, the California public trust doctrine reserved in the state of California the rights and the duties to maintain the waters above and to hold them in trust for its citizens. And so it is an implied an implied reservation in those 19th century conveyances that was retained with the state of California. Now, with the modern leases, which, in fact, duplicate some of the area of bottomlands. And so question why the federal government was trying to lease the same lands that it has that sometimes says it owns. But that aside, those leases expressly state that the California public trust rights in the waters above are reserved. You seem to be assuming that for the Department of Interior, for the National Park Service to have jurisdiction over these waters, they had to acquire them in some formal sense. But Sturgeon tells us these kinds of waters aren't actually ownable in the ordinary way we think of that. How do you respond to that? Right. And I would say, Judge Breast, that in Sturgeon, that was a problem for the government, not for the challenger. And it should be the same here. Congress laid out a statutory scheme that took account of two conflicting interests. One is the desire to preserve the recreation area, just as with the Alaska parks. And the other was to preserve state and local control over in holdings that existed currently and to create a means for those two goals. There was a very unique history to the Alaska statutes that we just don't have here. The language was also fairly different as well in some material ways, I think. I'd love to address those two points in order. Number one, the scenario is quite similar, I believe. It differs in that we don't have the long history of Alaskan resistance to federal regulation. And this area is smaller. In Alaska, you ended up with a lot of different property interests in holdings because the federal government was setting aside 18 million acres. Here, the problem arises from a different context, namely that the park is created in a dense urban area. But it poses the exact same problem of many different in holdings and what to do with it. And while I didn't lay out the history quite as eloquently as Justice Kagan did for Alaska, the political problem was very much the same. And it's reflected in Congress's competing proposals. Shall we convey the entire area to the jurisdiction of the Department of the Interior? Or should we reserve certain state and local rights and have the department work that out later? And the Congress chose to do what it did with the Alaska statute later, which is convey federal properties to the department, but provide that other properties could be acquired and only if acquired thereafter administered. But why wouldn't you, why wouldn't we think that in 1972, when this was all initially established, Congress gave the National Park Service the ability to regulate waters which were already subject to federal jurisdiction. There was nothing further to acquire just in the same way that they started off with some landmass as well. They didn't have to acquire that, that was what they began with. Because the statute does not provide for the conveyance of federal interest in waters or a federal legislative power over waters, just as the Alaska statute doesn't. Is this true even though the government already has power as the National Park Service, what waters are the government's? I don't see how the government isn't already there because of that. Could you explain that to me, please? Sure. So as a matter of the property interest, the property interest resides in the state on the state's entry into the union. It succeeds to title to the bottom lands. And some of the earlier cases say title to the waters above. We obviously don't have a possessory property. So it's going to be able to give waters above because those belong to the government. These are navigable waters. Judge Wallace, they belong, unless the federal government has asserted a possessory interest by condemning those waters, then they are the state's waters. And the federal government's powers over those waters are its constitutional legislative powers. So what you're saying is that they could not even deal with these on the basis it's navigable water and they had the power to do that? Congress certainly has the power to do that. And the question is, in this case, whether Congress did that in the Organic Act or not. And so to circle back to Judge Bress's question, at the time of enactment, perhaps, Judge Bress, you're getting at the fact that the Organic Act at the time of enactment in 1972 did not use the term system units, but it did use the term park areas. And park areas were defined as the areas under the department's administrative jurisdiction. And so, again, even in the earlier version of the statute, you need to look to the statute that creates a particular park to determine what the meets and bounds of that park are and what the department's authorities are within it. The waters are clearly within the boundaries. And there are some directives given to the National Park Service to protect the area. There's also nothing in the statute that talks about how you would go about acquiring an interest in navigable waters, whereas there are a lot of provisions to talk about how you were to acquire interest in land. And so it seems that really what the statute is more suggesting is that by drawing this line and providing these directives, Congress was enabling the National Park Service to administer the waters. Judge Bress, the thing is that everything that you've just said about this statute is also true of the Alaska statute. And the only distinction that I see that's relevant is the Alaska statute states expressly that public lands, only public lands are part of the park. But that can't be the difference maker here because everyone agrees that the Section 3 and Section 4 of the Act here restrict the department's authority when it comes to lands. The question is just whether there is a basis to view waters, that provision, which is conceded to be a restriction, whether to read it as not applying to waters for some reason. What kind of interest could the federal government even acquire from California? If the navigable waters can't be owned and there's a public trust over the waters, what kind of interest is even available for purchase? Sure. Well, number one, the public trust right is a creature of state law. And so the state could change its laws by appropriate processes to allow itself to divest its interest in the waters above with a conveyance of the bottom lines. Secondly, as we've suggested, we think it's possible for the state to select between public trust uses. It could convey the bottom lands as well as a right and duty for the Park Service to regulate in a chosen manner to serve the California public trust. And Sturgeon points out a number of other ways that the department can achieve its goals with respect to waters where statutes have this sort of restriction. It says the department can regulate the shoreline. It can work with other agencies just to come up with agreements about how those agencies will regulate using their powers. And Sturgeon itself suggests that the department could acquire the bottom lines from the state. It faces the same public trust issue in Alaska, and that would require a state constitutional amendment. But there's an avenue there. So the point is. If the avenue requires a state constitutional amendment, the avenue is not much of an avenue. And then the assumption we are working with is that Congress set up this whole scheme only to have it be nearly impossible for the federal government to be able to regulate the waters that are clearly within the map and part of the area. So is it possible? That's what Congress had in mind, perhaps. But doesn't the opposing inference seem much more plausible? I don't think it does, Your Honor. And that's because it faced the same political problem that it did in Alaska. Namely, it wanted to create a park in the area, but it did not want to upend the current interest. And it wanted to save for another day how the relevant stakeholders would negotiate who regulates what. And again, the fact that the transfer of a property right here that would accomplish the purchase is sort of esoteric. What was the exact same problem faced by the Park Service in Alaska? And the Supreme Court was just simply not troubled by the fact that it would be hard, or that Congress had not spelled out in the statute how the Park Service could acquire the waters of the Nation Rivers. Instead, the court said the statute requires an acquisition of an interest. What interest has the government acquired? It has not acquired a relevant interest. And for that reason, we believe the inquiry should be the same here. If there are no other questions, I'd like to reserve my time. Okay, thank you. Ms. Catsellas. Good afternoon, and may it please the Court. My name is Anna Catsellas on behalf of the Department of the Interior. It's very important here to begin with the statutory scheme. Even before Congress established the Golden Gate National Recreation Area, the Park Service regulated activities on navigable waters within the boundaries of the National Park System. Regulations adopted in 1966 applied within the boundaries of any federally owned or controlled areas administered by the National Park Service. And those regulations regulated fishing, among other activities on those waters. In the 1976 amendment to the Organic Act, Congress clarified the Park Service's authority to promulgate regulations, concerning boating and other activities on or relating to water within system units, including water subject to the jurisdiction of the United States. Pursuant to its Organic Act authority, the Park Service has issued regulations, including the commercial fishing prohibition, applicable to persons within water subject to the jurisdiction of the United States, located within the boundaries of the National Park System. And I think that's all well established. I guess the opposing counsel is saying, well, yes, but the GGNRA is different. It is like the lands in Alaska Congress. You know, it set up a different framework for this particular area. So how do you respond to that based on the GGNRA Act? There are multiple problems with the association's interpretation of this statute. The GGNRA Act sets the boundary. It establishes the park's boundary, which no one disputes, encompasses the navigable waters at issue, which are along the park boundary, one quarter mile off the coast in San Francisco Bay. It section, you know, so the statute establishes the boundary. It declares, it declares that the recreation area comprises the lands, waters and submerged lands within the boundary. So those are the operative provisions of the GGNRA Act that must be given to effect. The association suggests those are statements of general statements of purpose, but they are not. Section one and section two are operative in bringing these waters within the boundary and within the national park system. And it's important to understand how these statutes are structured. Congress uses a very sort of a similar pattern when it establishes national parks. So there is a section about composition and boundaries. There's a section about acquisition. Section four, on which the association relies, is an administration provision that is telling the park service the rules by which this will be administered. And that is the Organic Act. So the Organic Act, as well as any available statutory authority that the secretary deems appropriate to conserve and manage wildlife and natural resources in the recreation area. Is section four referring to at least the first part of the sentence, shall administer the lands, waters and interests therein acquired? Is that referring to interests that are acquired after 1972? In other words, interests that are subsequently acquired? I mean, the rest of the sentence and the rest of that section is more general and would seem to apply to just everything, including what was given to the Department of the Interior initially. But is the first sentence really more essentially forward-looking, meaning if you acquire something later, you also get to regulate it consistent with these principles? Yeah, the word must be understood in its context and with a view to its place in the overall scheme. It is used as Congress is using the word in that in section four. It is general. It is inclusive. It is telling the park service to administer everything over which the park, over which there is federal control now or in the future as things are acquired. But it cannot bear the weight that the association has given it. And, you know, it is really it's very instructive to actually compare this statute to the statute at issue in Sturgeon, which is entirely different and reflects a very different congressional choice. So Congress enacted ANILCA against the backdrop of a century long struggle regarding federal authority over natural resources in Alaska. In that context, it defined the term public lands as a subset of federal lands and explicitly stated that only public lands within the park boundaries shall be deemed to be included as a portion of such unit. In the GGNRA Act, Congress made almost an opposite choice. It declared that the recreation area shall comprise the lands, waters and submerged lands generally depicted on the map. Congress did not define the term public lands in the GGNRA Act or provide that only such land shall be deemed to included within the recreation area. Instead, it directed the park service to administer the area in accordance with the Organic Act. So I mean, with respect to lands, there are some lands within the boundary area that were essentially in holdings. Yes. And I thought you the government had agreed in the district court that for lands there, the government did have to make an acquisition, even when it was within the boundary line. Is that correct? That's correct, Your Honor. And it's again, it's helpful if I could go back to the structure, because what is really operative here is 36 CFR 1.2 A1 and three in particular here. So by again, you know, in this statute, Congress set the boundary, included these waters within the boundary, further explicitly stated that they comprise. They are part of what comprises the recreation area. And then in Section four, it identified the applicable, you know, the rules essentially. And those were the Organic Act. And Section 1.3 A3 makes it very clear that within the boundaries of the National Park System, the Park Service regulates activities on navigable waters, regardless of the ownership of submerged lands. And just to further point that 1.3 B makes very clear that with respect to lands, that is not the case. Right. So federally, yes. So generally, you know, lands that are not federally owned and also Indian Trust lands are not generally subject to the rules of the General Park Service. It seems that the GGNRA Act, at least the land portion of it, the land portion is somewhat similar to the statutes in Sturgeon in the sense that if you haven't acquired the land, you can't administer the land consistent with the GGNRA Act. Is that a fair statement? Well, lands, and of course, this gives rise, I mean, in a sense, Your Honor, yes. I mean, as the Supreme Court discussed in Sturgeon, Alaska is a completely different creature and the language is not at all similar and it reflects a very different dispute, etc. But yes, and this raises another important point. It is possible to have a property interest in land. It is impossible to have a property interest in navigable water. And so this raises an important point because this is really the first and foremost reason that the association's proffered interpretation of this statute fails. California does not hold title to the navigable water in San Francisco Bay. The Supreme Court made it abundantly clear that no one holds title to that. And in construing the statute, the court, you know, Congress can be expected to have known that bedrock principle when it enacted the statute. And Your Honors, respectfully, if you look at Section 3A of the GGNRA Act, which omits the term waters in describing what the Park Service might acquire from the state, further illustrates that Congress, in fact, knew this principle and accordingly contemplated no transfers of water between the sovereigns. It is implausible that Congress would have conditioned the Park Service's authority over navigable waters on the acquisition of a property interest that does not even exist and cannot be obtained. I think in response to Your Honors... Judge Wallace, were you trying to interject with the question? Yes, could you entertain the question? The sturgeon case is the one I'm interested in. I noticed that it was cited by your opponent in the High Brief, which is very strange. Usually it comes in public, but you haven't had a chance to tell us the government's position on sturgeon. Could you give me your view of why, if you do take the position sturgeon doesn't change, why that's true? Oh, certainly, Your Honor. I think, in fact, sturgeon is actually helpful to the Department of the Interior in this case in illustrating that if Congress had wanted to impose this remarkable condition on the Park Service's normal authority, which, you know, and in sturgeon, the Supreme Court actually does a nice job of explaining this statutory scheme. And, you know, this is the rule throughout the United States. It's Alaska that is different. But, you know, Congress enacted ANILCA against completely different circumstances. You know, there was a lot of concern. There had been a century-long struggle regarding federal authority there. But, you know, here, you know, the backdrop is very different. There was some concern about state-owned lands and private-owned lands within the boundary. There was no concern about navigable water. There's nothing in the legislative history, no concern about fishing, nothing here. And then, you know, there's just a completely different statutory structure and language. So, again, the provision that the Supreme Court interpreted is 16 U.S.C. 3103C. And in that provision, you know, so Congress, first of all, defined the term public lands specifically for ANILCA as a subset of federal lands. And then explicitly stated that only public lands within the park boundaries shall be deemed to be included as a portion of such unit. Right? There is no comparable language in the GGNRA Act. There is no, nothing suggesting that the water should not be deemed a portion of the unit. The contrary, Congress expressly declared that the boundaries, drew the boundaries to include these waters. And then, furthermore, expressly stated that they comprise the recreation area. And so it's just a very different choice. And we think that, you know, we think it's very clear from the structure of this statute that Congress did not impose this extraordinary condition. It would have done so more, it would have made its intention much clearer. When they drew the boundary that included the water and told the National Park Service to protect that area, that was sufficient to give them the authority to administer the water? Correct, Your Honor. And again, it's relevant here that the Park Service regulated activities on navigable waters, even before the statute was enacted. But then, were there any ambiguity about that? That ambiguity was eliminated in the 1976 Amendment to the Organic Act, in which Congress clarified the Park Service's authority to promulgate regulations, quote, concerning boating and other activities on or relating to water located within system units, including water subject to the jurisdiction of the United States. So it's very clear. And, you know, it's also relevant here that the waters at issue are along the edge of the boundary of this statute. They're not in the middle of the park. It's along that, you know. So if Congress had intended, and what I was trying to say earlier is I think that I think that Counselor for the Association has said that that Congress may have intended to impose an impossible condition. But, you know, if Congress intended to prohibit the Park Service from ever administering these waters as part of the park, it would have simply drew the boundary to exclude them. Your opposing counsel suggested there might be some kind of conveyance or interest that could be obtained from the state. How do you answer or respond to that? Well, Your Honor, I think it's significant. I mean, I there is no there is no there is no title in navigable water. And so there is no there is no lesser property interest that would be derivatives of such title to convey. You know, notably, you know, that, you know, the district court invited the state of California views on this matter, of course. And the California State Lands Commission didn't even respond to the question about whether there could be whether there's title in navigable water. It's just well understood that that that is not a thing, Your Honor. And so that's and that incorrect premise is what the association's entire case is, is based on that. And it falls apart when that is when that is when it's acknowledged. And again, Congress knew that, you know, this is, you know, the Supreme Court made it very clear. And of course, that wasn't you know, there was no interest in water at issue in Sturgeon. Right. Sturgeon was about the submerged lands underneath the nation river, which the state of Alaska held title to. And because of the unique language of, you know, limiting the federal government's authority to public lands, which is defined specifically for that statute. The Supreme Court found that that was outside of the of that part. But again, there's no there's no comparable choice. You know, and that, you know, as the Supreme Court explained under the normal under the normal circumstances, it's, you know, the Park Service regulates activities on navigable water system wide. When you look at Section 4 of the GTNRA Act, shall administer the lands, waters and interests there and acquired for the recreation area. Is it your position that these navigable waters were in a very general sense acquired in the in the sense that they were within the boundaries and already subject to federal jurisdiction and Congress then directed the Park Service to regulate them? In that general sense, I think, again, yes, in that in that in Section 4, the term is used in a very general sense. And it's used inclusively to sort of to direct the Park Service to make sure that the Park Service knows to administer lands, waters, everything within the boundaries pursuant to the Organic Act and statutory authority available to it. You know, and again, Section 3 is a specific acquisition section. And if Congress intended to impose this, you know, rule about and as you as you recognize, Judge Press, there are some very specific limitations in that section about. And also in Section 2, for example, there are things that the Park Service is prohibited from acquiring. So if Congress had intended to, you know, impose this remarkable condition, it would have made its intention more clear. And we maintain that this is very this is evident from the statute itself. But respectfully, you can go the court can go to Title 16 and look at statutes for establishing other parks and see that this familiar structure. Right. There's composition and boundaries section. There's, you know, acquisition. There's administration, which with respect to land, there is a formal acquisition requirement. In other words, if I own a ranch within the GGNRA, the National Park Service can't just come and regulate my property unless it actually purchases it from me or unless I donate it or somehow convey it. Correct. And that's pursuant because those rules are established again in 36 CFR 1.2 and 36 CFR 1.2B makes it very clear that generally privately owned land and trust Indian trust land is not is not subject to Park Service regulations. But the rule is different for navigable water. And that's 1.2A3. And so this is and this is why, you know, Your Honor, this is this is the Park Service's formal interpretation of its authority granted in the in the Organic Act. Right. These regulations prohibiting commercial fishing have been in effect for, you know, since 1983. And also, Your Honor, we dispute that there is any inconsistency in the position. Right. I mean, we've submitted in our supplemental excerpts of record for, you know, since 2003, the Park Service has issued notices restating that the prohibitions applicability in these waters at issue and citing 1.2. It's not relying on legislative jurisdiction or any of these things, but it's relying on this on this ownership and different authority that that it has. And so it's been very clear for a long period of time that this is the agency's, you know, formal interpretation. So if the court we think it's clear, but in the event that the court thinks that there is any ambiguity in the statute, the the Park Service's interpretation is entitled to deference. Okay, thank you, Ms. Katsalas. We appreciate your argument. Could I ask one more question? Of course, Judge Wallace. This is not the first time I've had this issue, I don't know, in prior cases. Things that bothered me there, in the back of my mind, I didn't ask and I'm going to ask them now. The government's got a responsibility to not only keep parks nice and rest of that, but there are certain benefits that people get from that area. For example, I'm a surfer and I understand that's navigable water out there. If somebody wants to try and navigate over the ocean, but there's also a right that people have to go out and use it. Similarly here, there's a right that fishermen are going out. These are small business people who are making their living not doing anything wrong. So how do you balance those two rights off so that we protect other rights other than the fiat that comes from Washington, D.C.? Sure, Your Honor. I understand the question. I think there are multiple avenues for accommodating various interests. Again, when you look at different statutes, Congress, for example, the commercial fishing prohibition provides for an exception by statute. The statute creating Biscayne National Park actually includes an exception. It specifically in the administration provision has a rule allowing fishing pursuant to the laws of Florida. So that is something that should be addressed in the first instance by Congress. Congress has addressed that when there have been concerns. I think in this case, the boundary includes a very small portion of the Bay, Your Honor. It's only a quarter mile offshore. There were issues that were worked out when the legislation was being drafted, but this was not something that was a concern. Also, the commercial fishing prohibition is regulatory. The association could go to the Park Service. They could petition the Park Service to make an exception to do something special by a special regulatory exception. So there are avenues for people to raise these concerns to the Park Service. Again, this is a commercial fishing prohibition. If you look again at the regulation 36 CFR 2.3, fishing is permitted. There is fishing that is permitted in the park system. And in the statute in Section 1 of the GGNRA Act, Congress directed the Park Service to preserve the recreation area as far as possible in its natural setting. So this is entirely consistent with that. But again, there are avenues. I think, Your Honor, there are avenues for people who are concerned about impacts on them in particular ways to go to Congress or to go to the agency to have those addressed. But that has not happened here. Counsel, excuse me to go back to what Judge Wallace was saying or his question. Is there a difference between commercial acts versus recreational? Well, the Park Service. That's what I think we're talking about here. You know, if you like to surf, you like to boat, you like to do whatever. And now you've got this regulation that says that you can't do X, Y, and Z. Is there a distinction between the two as far as the government is concerned?  This, again, it's in the regulations. I mean, the Park Service has made a determination system-wide to prohibit commercial fishing. And the regulation sort of makes clear that there is a distinction between commercial and non-commercial fishing. But, again, there are avenues for exceptions to be made in specific parks. And Congress has done that. So, again, Biscayne is one example. Congress has, by statute, allowed fishing there. And, again, the association could go to the agency. So there are avenues for these interests to be accommodated. And Congress has accommodated them in the past. But, again, there was never any concern. When the GGNRA Act was being drafted, there's nothing in the legislative history showing that there was any concern about impacts on fishing or commercial fishing. I understand your point. Thank you very much for the explanation. Thank you. Thank you, Ms. Goodsell. We've taken you over your time, Mr. Gregorian. We want to give you the opportunity to respond. There's lots of responses. We'll put five minutes on the clock just to make sure you have sufficient time. And we'll ask you to unmute, and we'll be prepared to hear from you. Thank you, Your Honor. Let me just pick up with where counsel finished, which was sort of the statement of the agency's policies for its other parks. That concerns the regulations. And we're dealing with a much more fundamental question here, which is whether the statute empowers the agency to act as it did. The area in which it is acting is, in fact, quite important. Although it's only a quarter mile from the shore, that is the region where herrings spawn close to shore. So it's of crucial importance to the fishermen here. So the government has advanced sort of two different views of this statute. One, the strong view, and two, the weak view. The strong view that we're hearing more or less for the first time at argument today is that in the composition section of the GGNRA Act, by drawing the boundaries, Congress empowered the Park Service to act and regulate everything within those boundaries under the Organic Act. That's not a position the Park Service has taken before. And as Judge Bress recognized, it's got a major problem, which is that everyone, including the Park Service, up to this point has acknowledged that Section 3 and 4 operate to restrict its ability to regulate at least lands within the boundaries. Judge Bress asked if that restriction operates only as to later acquired lands. I don't think that is correct. I agree with the government there that that word acquire in the statute refers to lands and waters and interest therein acquired by any means. And if the court's interested in corroborating that, I'd refer to the Everglades statute, as I believe all of the relevant property interests were conveyed in the statute itself. But the statute also uses... Why weren't the waters acquired in the very general sense that the word is used here? They were not transferred through some conveyance or legal instruments in the way that we might think of land being acquired. But they were, I think, fairly put within the bounds of the property. I agree, Your Honor. They were fairly placed within the boundaries, just as the flow of the Nation River was fairly placed within the boundaries of the Yukon Charlie Preserve in Alaska. That said, we have a statutory provision that limits the department's authority to areas that it has acquired. And the Supreme Court has held that although there is not a title that can be acquired to the flow of the river, that restriction still operates on the waters within the boundaries. And there's no reason to decouple lands from waters in the statute. That holds true here. The structure is the same. There is an acknowledged restriction. It's hold true, though, because it seemed that in the Alaska statutes, there was a particular statutory connection between the land and the water. That was all tied in in a way that land was defined to include water. And there was then particular language used about title and deeming, but we don't have that here. So there's a couple of pieces to that. The first is that the property interests are referred to in the same way, lands, waters, improvements, and interests therein in both statutes. The courts correct that there is an express exemption of lands and waters within the boundaries of the Alaska Park from the park. And that's in Section 103C. We don't have that express language here. But what we do have is Section 3 and 4, which everyone agrees is to the same effect as to lands. And so the question must be, is there a reason to treat waters differently? And the Supreme Court says no in Alaska, notwithstanding the esoteric nature of the property rights and notwithstanding the fact that Congress had a general purpose to preserve waters within the boundaries. With that, Your Honor, I'd just like to address the issue of deference. There is no formal interpretation that has been offered by the agency for this statute. And its position in this case is contrary to that it took for the 30 years prior to its assertion of jurisdiction. And it's one created for purposes of litigation and so does not receive deference under Chevron. If there are no further questions, Your Honor, the Herring Association would request reversal. Okay, I want to thank both counsel for the very helpful briefing and arguments today. The court greatly appreciate it. We appreciate it. And this matter is submitted. It also concludes our calendar for today. Thank you all.
judges: WALLACE, BRESS, England